UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ADAM C. STICKLER

        Plaintiff

v.                                    CIVIL ACTION NO.:

JANET L. YELLEN, SECRETARY
DEPARTMENT OF THE TREASURY,

        Defendant

## COMPLAINT

### INTRODUCTION

1.    This case is brought to this Court as a result of an openly gay employee at the Department of the Treasury being subjected to a campaign of discrimination and retaliation where, among other things, a Treasury employee wished he would **"die" and "suffer" with "buildings collaps[ing]" on him**, where he hoped he would be stranded and **"suffering for days"** and he hoped that "[the Plaintiff'] **would die of AIDs."** Incredibly, this vile discrimination did not happen 70 years ago – it happened in the 21st first century in the Executive Branch of the United States government.

2.    Plaintiff, Adam Stickler, is an outstanding former Department of the Treasury, Treasury Inspector General for Tax Administration ("TIGTA") Supervisory Criminal Investigate/Assistant Special Agent in Charge ("ASAC").

3.      For almost a decade, Plaintiff received the highest performance evaluations

available to TIGTA employees as well as multiple performance awards, accolades

and performance based commendations.

4.      Unfortunately, beginning around 2018, Plaintiff's outstanding work as an ASAC

was overshadowed by a dark and seething underbelly of discrimination and

whistleblower retaliation within TIGTA.  For several high-level employees within

TIGTA, Mr. Stickler's sexual orientation and his forthrightness in opposing

discriminatory employment practices constituted a severe and immediate threat to

the administration and old boys network of TIGTA officials.

5.      As described more fully below, this led one such employee to vocalize that he

wished Mr. Stickler "died in an earthquake in California" and "die of AIDS."

6.      This employee stated that he wished Mr. Sticker would "suffer" and hoped a

"building would collapse on [Mr. Stickler] trapping him for days to "suffer before

ultimately dying."

7.      Given the vindictive hate towards Mr. Stickler's sexual orientation, his protected

complaints of sexual orientation discrimination at TIGTA and a 2016-2020

Executive branch policy of outing and silencing whistleblowers, it is not

surprising that a tight group of high-level TIGTA employees embarked on a

campaign of discrimination and retaliation against Mr. Sticker where he was

denied multiple promotions, reassigned to less a prestigious position, had his

supervisory and other responsibilities stripped, told he could not wear certain

clothing and was issued various other adverse actions.

2

8.    The toxic culture of discrimination and retaliation at TIGTA between 2018 and
      early 2021 was unbearable for Mr. Stickler.   No employee, regardless of race,
      creed, or sexual orientation, should be subject to a work environment where
      coworkers wish "death" and "suffering" on such person.   Defendant's behavior
      was intolerable and constituted a violation of federal law.

9.    On multiple occasions, Plaintiff reached out to TIGTA Inspector General, J.
      Russell George who either ignored Plaintiff's pleas for help or avoided speaking
      to Plaintiff about his complaints.

10.   Defendant's actions, as well as its total disregard of Mr. Stickler's civil rights, led
      Mr. Sticker to file the instant complaint seeking damages and relief against the
      Department of the Treasury for violations of Title VII of the Civil Rights Act of
      1964, 42 U.S.C.§2000(e),*et seq.*

## JURISDICTION AND VENUE

11.   Jurisdiction in this Court is proper pursuant to 28 U.S.C. §1331.

12.   This Court has original jurisdiction over this matter as this case "arises under
      federal law," i.e., Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et
      seq.*

13.   Venue is proper in this Court under 28 U.S.C. §1391(b) because the actions
      giving rise to Plaintiff's claims occurred in the District of Columbia.

14.   Venue is proper in this Court under 42 U.S.C. § 2000e-5(f)(3) because the alleged
      wrongdoing was committed in the District of Columbia, the Plaintiff's post-of-
      duty was located in the District of Columbia and Plaintiff's employment records

are kept in District of Columbia and the employment decisions at issue in the case occurred in the District of Columbia.

## PARTIES

15. Plaintiff, Adam Stickler, is a resident of the Commonwealth of Virginia.

16. Plaintiff was employed by the Department of the Treasury, TIGTA (hereinafter referred to as "Defendant" or "TIGTA" or "Agency") at all times relevant to this complaint.

17. Plaintiff, is an openly gay man.

18. Defendant, Janet Yellen, Secretary, is the current Secretary of the Department of the Treasury.

19. At the time giving rise to these allegations, the Secretary of the Department of the Treasury was Steven Mnuchin.  Secretary Mnuchin was appointed by former President Donald Trump on February 13, 2017.

## FACTUAL ALLEGATIONS

20. Plaintiff began employment with TIGTA in 2009.

21. Since Plaintiff began with TIGTA, Plaintiff's performance has been outstanding.

22. For example, Plaintiff received the Council of Inspector General on Integrity and Efficiency Award for Investigative Excellence.

23. Plaintiff also received numerous "Special Act Awards" for Plaintiff's commitment to the Agency and his exceptional performance in the execution of Plaintiff's duties.

24.     In July 2019, Plaintiff received a Special Act Award for spearheading TIGTA's
        compliance the federal Fix National Instant Criminal Background Check System
        Act.

25.     In 2020 Plaintiff received three "Special Act Awards" for Plaintiff's extraordinary
        investigative work.

26.     Between 2015 and 2017, Plaintiff received various performance awards for
        exceeding performance expectations by a substantial margin.

27.     Between 2009 and 2021, Plaintiff had a distinguished career with TIGTA
        exemplified, exemplified by numerous instances of outstanding performance.

28.     Plaintiff is an openly gay male.

29.     Unfortunately, Plaintiff's sexual orientation combined with his exceptional
        performance made him a target for several high-ranking TIGTA officials in or
        around 2018 that held a discriminatory bias towards Plaintiff's sexual orientation.

30.     By and large, between 2016 and 2020, TIGTA was dominated by straight male
        law enforcement professionals.

31.     For a few of the high level straight male law enforcement officials at TIGTA,
        Plaintiff's sexual orientation did not fit with their outdated vision of TIGTA's law
        enforcement culture.

32.     At times relevant to this complaint, Plaintiff was supervised by Andrew McKay
        (straight/male).   At times relevant to this complaint, many aspects of TIGTA
        were supervised by Assistant Inspector General for Investigations, Jeffrey Long
        (Senior Executive Service)(straight/male).

33. Beginning in or around 2018, it became apparent to Plaintiff that Plaintiff's supervisors were purposefully discriminating against Plaintiff because of or motivated by Plaintiff's sexual orientation.

34. Soon after Mr. McKay was selected for the Special Agent in Charge (SAC) position as  Plaintiff's supervisor, Mr. McKay met with Plaintiff and immediately expressed his discriminatory animus toward Plaintiff.

35. At the time of the meeting, Mr. McKay was aware that Plaintiff is a gay male.

36. Mr. McKay told Plaintiff that he believed Plaintiff had received preferential treatment from the Agency in the past, based on his status as a gay male.

37. Mr. McKay told Plaintiff that when he (Mr. McKay) and Plaintiff had previously worked together, Mr. McKay believed that Plaintiff had been afforded special acting assignments that Mr. McKay deserved or that Plaintiff did not deserve.

38. The reasonable inference from these discussions is that Mr. McKay held a discriminatory belief that Plaintiff had only performed or been selected for acting assignments due to his sexual orientation.

39. Mr. McKay belittled Plaintiff during the meeting and told him that Mr. McKay was in charge now – or words to that effect.

40. After the meeting, Mr. McKay denied Plaintiff numerous requests for training on budget process.

41. This training was an essential element of Plaintiff's job and terms and conditions of employment.

42. However, Mr. McKay approved training requests for three similarly situated straight employees.

43.     On numerous occasions, Mr. McKay told Plaintiff that he does not act "professionally."

44.     Mr. McKay's numerous comments about Plaintiff not acting "professionally" were code for Plaintiff acting "gay."

45.     Mr. McKay did not accuse straight similarly situated employees of not acting "professionally."

46.     Mr. McKay expressed that he did not like Plaintiff's dress or manner of speech, which McKay believed to be associated with Plaintiff's sexual orientation.

47.     Mr. McKay denied Plaintiff the opportunity to give public presentations because Plaintiff is gay, whereas Mr. McKay provided such opportunities to similarly situated straight employees.

48.     Mr. McKay denied Plaintiff these opportunities because Mr. McKay did not want a gay male to represent the Agency in communications with other Agencies or in a public setting.

49.     Mr. McKay tried to attribute various mistakes at the Agency to Plaintiff because Plaintiff is a gay male, even though Mr. McKay knew that Plaintiff was not responsible for the mistakes.   Mr. McKay did this to negatively impact Plaintiff's perceived performance, which impacts future prospects for promotion, raises and other benefits of employment.

50.     However, when Mr. McKay was aware of other similarly situated straight employees making mistakes, or, for example, failing "quarterly complaint reviews," Mr. McKay did not lay blame at the feet of those employees or attempt to negatively impact their perceived performance.

51.  As a manger, Plaintiff was responsible for supervising a team.  However, unlike
Plaintiff's similarly situated straight coworkers, Mr. McKay would openly
question Plaintiff's work and authority to his subordinates, manage Plaintiff's
team directly, fail to approve Plaintiff's projects or tasks and take other actions to
adversely affect Plaintiff's perceived performance.

52.  Mr. McKay took these actions so he could, in essence, take a successful, hard-
charging, openly gay male ASAC down a peg-or-two.

53.  In addition to maliciously attempting to impact Plaintiff's perceived performance,
McKay stripped Plaintiff of his fundamental job duties.   After returning from a
vacation, Plaintiff learned that McKay had taken Plaintiff's responsibilities for the
Inspection team away from him.   This action eliminated Plaintiff's supervisory
authority over approximately 4 employees.

54.  Eliminating Plaintiff's Inspection team supervisory duties fundamentally altered
the nature of Plaintiff's position and drastically decreased his level of supervisory
authority and managerial responsibilities.

55.  During McKay's first performance evaluation over Plaintiff, McKay rated
Plaintiff as "exceeded" even though Plaintiff had earned "outstanding" ratings
during his employment.  The failure to provide Plaintiff with an outstanding
rating materially impacted Plaintiff's future employment prospects, promotional
opportunities, bonuses and other terms and conditions of Plaintiff's employment.

56.  McKay required Plaintiff to be physically in the office whereas McKay allowed
similarly situated straight employees to regularly telework.

8

57.   McKay instructed Plaintiff that he was not to perform work outside of the physical office, whereas Mr. McKay permits similarly situated straight employees to work from home or outside of the office.

58.   Jeffrey Long (SES/straight male) has supported Mr. McKay in Mr. McKay's endeavors to ostracize and discriminate against Plaintiff in his employment.

59.   Mr. Long attempted interfere with Plaintiff's handgun requalification because Plaintiff is gay and because of Plaintiff's prior protected activity.

60.   Mr. Long did not interfere with similarly situated straight employees non-complaining employees' handgun qualification.

61.   Mr. Long belittled Plaintiff to his colleagues based on Plaintiff's sexual orientation, instructing employees that Plaintiff was not to be trusted, or words to that effect.

62.   Mr. Long told other employees not to speak to Plaintiff because of Plaintiff's sexual orientation, or words to that effect.

63.   Mr. Long purposely assigned Plaintiff a vehicle that was in an unsafe working condition and had been in an accident whereas other similarly situated straight employees were not assigned dangerous or "accident" vehicles.

64.   Mr. McKay and/or Mr. Long refused to submit Plaintiff's application for consideration of the Instruction Cadre, while submitting applications for other similarly situated straight employees.

65.   By 2018, Plaintiff was at a breaking point with the hostile work environment created by Mr. McKay and Mr. Long.

66. Plaintiff was under the care of a doctor for stress, anxiety, depression and other physical and mental consequences of the Agency's actions.

67. On March 15, 2018, Plaintiff engaged in protected activity by filing a complaint of discrimination with the Agency.

68. McKay told Plaintiff that Plaintiff would be placed on a performance improvement plan that McKay wanted Plaintiff to draft.

69. McKay threatened to place Plaintiff on a Performance Improvement Plan that McKay told Plaintiff that he would "have to write [himself]."

70. McKay also forbade Plaintiff from wearing "sweaters" in the office, although McKay did not similarly instruct Plaintiff's peers.  By contrast, McKay permitted a straight similarly situated female employee to wear tight, revealing clothing.

71. McKay gave this instruction to Plaintiff due to McKay's bias against Plaintiff's sexual orientation.

72. If Plaintiff's original sin in the eyes of Mr. McKay, Mr. Long and the Agency was that he is gay, Plaintiff's cardinal sin was that he had violated the law enforcement code by complaining about his treatment.

73. Moreover, Plaintiff's complaint came at a time when the Executive branch was openly hostile towards whistleblowers and other government employees that revealed illegal activity by government officials.

74. Immediately after Plaintiff engaged in protected activity under Title VII, the Agency began retaliating against Plaintiff.

75. On July 17, 2018 September 5, 2018; October 26, 2018; November 23, 2018 and February 4, 2019, Plaintiff was denied lateral assignments, promotions and

instructor assignments and selection to the instructor cadre. Plaintiff was qualified for these positions.

76. Moreover, after Plaintiff engaged in protected Title VII activity, the Agency began pressuring him to drop his complaint.

77. Mr. Long, who carries a firearm in the office, physically threatened Plaintiff and told him he better "stay in his lane" and that he was "worthless" or words to that effect. Mr. Long engaged in this interaction in an attempt to silence Plaintiff's complaints about discrimination.

78. When physical threats and intimidation did not work, Mr. Long and James Jackson, Deputy Insp. General for Investigations (Senior Executive Service ("SES")(straight male), took it to the next level by initiating an Internal Affairs investigation against Plaintiff with the ultimate goal of disciplining Plaintiff.

79. In a meeting between Mr. McKay, Mr. Jackson and Plaintiff wherein Mr. McKay and Mr. Jackson discussed discrimination complaints, Mr. McKay and Mr. Jackson called Plaintiff a "liar," threatened him for "writing things down" related to the discrimination, told that his "integrity was eroding." When Plaintiff stood up and requested to leave the meeting, Mr. Jackson directed Plaintiff to "sit down" and told him "you are not free to leave."

80. Since filing his complaint, Plaintiff has been repeatedly called into meetings with Deputy Inspector General Jackson or had communications where Mr. Jackson threatened Plaintiff with termination and/or pressured Plaintiff to drop his complaint.

81.   At the conclusion of the meeting between Mr. McKay, Deputy Inspector General for Investigations Jackson and Plaintiff, Mr. Jackson followed Plaintiff to his office and told him "TO WRITE THIS DOWN" – and told Plaintiff he was not to say anything else about his complaint to any person outside of "OFFICIAL CHANNELS," i.e., Mr. McKay and Mr. Jackson.

82.   When that didn't work, the Agency made false allegations regarding Plaintiff's email activity and threatened disciplinary action against him.

83.   On or about October 31, 2018, Mr. McKay lowered Plaintiff's performance appraisal.

84.   The lowered performance appraisal materially impacted Plaintiff's opportunities for promotion, bonuses and other benefits of employment.

85.   In December 2018, Mr. McKay asked Plaintiff to step down from his position.

86.   The Agency's efforts to silence Plaintiff's discrimination complaints reflect a culture of whistleblower retaliation and intimidation that were prevalent between 2016 and January 2020.

87.   Although Plaintiff was demoralized, despondent and feared for his safety, Plaintiff refused to give in to Mr. McKay, Mr. Long and Mr. Jackson's threats and coercion and determined not to succumb to the whistleblower intimidation tactics that the Executive branch openly applauded and supported at the time.

88.   Plaintiff continued to engage in protected activity between 2018 and 2020 by participating in the Equal Employment Opportunity process, engaging in the mediation process and voicing his opposition to unlawful employment practices.

89.     Perhaps bolstered by a culture of retaliation and whistleblower intimidation
        emanating from the top ranks, Mr. McKay, Mr. Long and Mr. Jackson doubled
        down on their attempts to remove, harass and/or create a hostile work
        environment for Plaintiff on account of his sexual orientation and protected
        activity.

90.     After an April 24, 2019 mediation wherein the Agency agreed to resolve
        Plaintiff's claims of discrimination, the Agency denied Plaintiff six (6)
        promotional opportunities for which Plaintiff was the best qualified candidate.
        Plaintiff was denied the opportunity to serve in Special Agent in Charge and
        Deputy Special Agent in Charge assignments.  Plaintiff was denied three
        opportunities to serve as Acting Special Agent in Charge for the Northeastern
        Field Division and was not selected to serve as the Acting Special Agent in
        Charge for his own division on two separate occasions.

91.     The denial of these positions negatively affected and/or caused Plaintiff to be
        denied promotion to a GS-15 position.

92.     Moreover, Plaintiff was reassigned from his position by Paul Brilliante, then
        Acting Assistant Inspector General for Investigations.

93.     The reassignment substantially altered the terms and conditions of Plaintiff's
        position.

94.     The purpose of the reassignment was to relegate Plaintiff to a significantly less
        visible position with less managerial authority.

95.     Moreover, the reassignment removed all criminal investigation work which was
        the defining feature of Plaintiff's position.

96.    Soon after Plaintiff was reassigned, Plaintiff told Mr. Brilliante that he believed
       the reassignment was retaliatory for Plaintiff's protected activity.

97.    At all times relevant to this complaint, Mr. Brilliante was aware of Plaintiff's
       protected activity.

98.    On or around June 7, 2019, Mr. Brilliante called Agency employee Karen
       Thompson (Special Agent in Charge).

99.    During this  phone call, Mr. Brilliant brought up Plaintiff's discrimination and
       retaliation complaint and lamented that he has received an "affidavit with over
       one hundred questions that he had to respond to."

100.   Sometime after this conversation, Mr. Brilliant met with Ms. Thompson in Ms.
       Thompson's office.

101.   When Ms. Thompson and Mr. Brilliante began discussing Plaintiff, Mr. Brilliant
       became "visibly annoyed."

102.   Mr. Brilliante then stated that he "hopes Mr. Stickler **dies from AIDS."**

103.   At the time he made this comment, Mr. Brilliante was aware of Plaintiff's sexual
       orientation and his prior protected activity.

104.   During the same conversation, Mr. Brilliante stated that he hoped Mr. Stickler
       **died form an earthquake in California."**

105.   Mr. Brilliante stated that he wished Mr. Stickler **"did not die immediately, but
       rather, that he lay there and suffer for days."**

106.   At the time that Mr. Brilliante made these comments, Plaintiff was authorized to
       accept a reassignment to a vacant TIGTA position in California.  However, Mr.
       Jim Jackson and/or Ruben Flores (Assistant Inspector General for Investigations-

14

Field Operations) notified Rod Ammari, SAC regarding Plaintiff's prior protected EEO activity and Mr. Ammari indicated to Plaintiff; by among other things, writing Plaintiff up for allegedly wearing jeans in the office (when Plaintiff was not wearing jeans), that Mr. Ammari did not want Plaintiff working for him in California.

107. In another conversation between Mr. Brilliante and Ms. Thompson, Mr. Brilliante informed Ms. Thompson that he had been contacted by the United States Department of Veterans Affairs concerning a reference for Mr. Stickler.

108. Mr. Brilliante informed Ms. Thompson that he had told the VA official that he would not rehire Mr. Stickler.

109. When Ms. Thompson asked Mr. Brilliante why he had said that, he told Ms. Thompson. **"that he did not think Mr. Stickler deserved the job because he filed EEO complaints"** or words to that effect.

110. Plaintiff was denied a Grade 15 position due to Mr. Brilliante's negative recommendation.

111. Plaintiff herein files this complaint seeking damages against the Defendant for Defendant's violations of Title VII of the Civil Rights Act of 1964, *as amended.*

112. Plaintiff has administratively exhausted all prerequisites to filing this suit.

**COUNT I – DISPARATE TREATMENT (MALE SEX STEREOTYPING) GENDER DISCRIMINATION IN VIOLATION OF TITLE VII 42 U.S.C.§2000(e),*et seq.***

113. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

114. Plaintiff is male.

115. Plaintiff is a member of a protected class

116. At all times relevant to this complaint, Complainant has maintained satisfactory job performance;

117. Plaintiff suffered multiple adverse employment actions.

118. Defendant took adverse employment actions against Plaintiff because of Plaintiff's gender.

119. Defendant was motivated by Plaintiff's gender in taking the aforementioned adverse employment actions

120. The aforementioned adverse employment actions give rise to an inference of discrimination.

121. Defendant took the aforementioned adverse actions because of Plaintiff's nonconformity with male sex stereotypes.

122. As a proximate result of Defendant's actions, Plaintiff suffered humiliation, fear, intimidation, ridicule, upset, economic losses and other emotional injuries and will suffer severe damages and injuries including but not limited to, humiliation, loss of self-esteem, hurt, fear, frustration, emotional distress inconvenience and damage to his professional reputation.

123. As a proximate result of Defendant's actions, Plaintiff suffered damages in the form of lost wages, lost compensation, future lost earnings, economic losses, future loss of retirement benefits.

**COUNT II – DISPARATE TREATMENT (MALE SEX STEREOTYING) GENDER DISCRIMINATION (HOSTILE WORK ENVIRONMENT) IN VIOLATION OF TITLE VII 42 U.S.C.§2000(e),*et seq.***

124. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

125. Plaintiff was subjected to sex discrimination by virtue of a hostile work environment.

125. The hostile work environment was severe and/or pervasive.

126. Plaintiff perceived the work environment as being hostile and/or abusive.

127. The work environment was because of Plaintiff's sex and Plaintiff's nonconformity to male sex stereotypes.

128. Defendant is responsible for the hostility of the work environment.

129. As a proximate result of Defendant's actions, Plaintiff suffered humiliation, fear, intimidation, ridicule, upset, economic losses and other emotional injuries and will suffer severe damages and injuries including but not limited to, humiliation, loss of self-esteem, hurt, fear, frustration, emotional distress inconvenience and damage to his professional reputation.

130. Defendant was motivated by Plaintiff's gender and Plaintiff's nonconformity to male sex stereotypes in creating the hostile work environment.

## COUNT III – RETALIATION IN VIOLATION OF
## TITLE VII 42 U.S.C.§2000(e),et seq.

131. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

132. Plaintiff engaged in protected activity.

133. Plaintiff engaged in opposition and participation activity under Title VII.

134. Plaintiff had a good faith belief that he was opposing activity prohibited by Title VII.

135. Plaintiff had a reasonable belief that he was opposing activity prohibited by Title VII.

136.    Defendant and Defendant's agents were aware of Plaintiff's protected opposition and participation activity prior to taking adverse actions against Plaintiff.

137.    Plaintiff has suffered adverse actions.

138.    There is a causal connection between Plaintiff's protected activity and the adverse actions Plaintiff has suffered.

139.    As a proximate result of Defendant's retaliation, Plaintiff suffered humiliation, fear, intimidation, ridicule, upset, economic losses and other emotional injuries and will suffered severe damages and injuries including but not limited to, humiliation, loss of self-esteem, hurt, fear, frustration, emotional distress inconvenience and damage to his professional reputation.

140.    As a proximate result of Defendant's retaliation, Plaintiff suffered damages in the form of lost wages, lost compensation, future lost earnings, economic losses, future loss of retirement benefits.

**COUNT IV – RETALIATORY HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII 42 U.S.C.§2000(e),*et seq.***

141.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

142.    Plaintiff engaged in protected activity under Title VII.

143.    Plaintiff engaged in protected participation activity under Title VII.

144.    Plaintiff engaged in protected opposition activity under Title VII

145.    Plaintiff had a good faith belief that he was opposing activity prohibited by Title VII.

146.    Plaintiff had a reasonable belief that he was opposing activity prohibited by Title VII.

147.    The Agency was aware of Plaintiff's protected activity at the time the agency took the aforementioned adverse actions against Plaintiff.

148.    There is a causal connection between Plaintiff's protected activity and the adverse actions taken against Plaintiff.

149.    Defendant took the aforementioned adverse actions against Plaintiff because of Plaintiff's protected activity.

150.    Plaintiff was subjected to retaliation by virtue of a hostile work environment.

151.    The hostile work environment was severe and/or pervasive.

152.    Plaintiff perceived the work environment as being hostile and/or abusive.

153.    The work environment was because of Plaintiff's protected activity.

154.    Defendant is responsible for the hostility of the work environment.

155    As a proximate result of Defendant's actions, Plaintiff suffered humiliation, fear, intimidation, ridicule, upset, economic losses and other emotional injuries and will suffer severe damages and injuries including but not limited to, humiliation, loss of self-esteem, hurt, fear, frustration, emotional distress inconvenience and damage to his professional reputation.

152.    As a proximate result of Defendant's retaliation, Plaintiff suffered damages in the form of lost wages, lost compensation, future lost earnings, economic losses, future loss of retirement benefits.

**COUNT V– DISCRIMINATION BASED ON SEXUAL ORIENTATION IN VIOLATION OF TITLE VII 42 U.S.C.§2000(e),*et seq.***

153.    Plaintiff incorporates by reference paragraphs 1 through 182 as if fully set forth herein.

154.    Plaintiff is gay male.

19

155.   At all times relevant to this complaint, Defendant was aware of Plaintiff's sexual orientation.

156.   Plaintiff is a member of a protected class

157.   At all times relevant to this complaint, Complainant has maintained satisfactory job performance;

158.   Plaintiff suffered multiple adverse employment actions.

159.   Defendant took adverse employment actions against Plaintiff because of Plaintiff's sexual orientation.

160.   Defendant was motivated by Plaintiff's sexual orientation in taking the aforementioned adverse employment actions

161.   The aforementioned adverse employment actions give rise to an inference of discrimination.

162.   As a proximate result of Defendant's actions, Plaintiff suffered humiliation, fear, intimidation, ridicule, upset, economic losses and other emotional injuries and will suffer severe damages and injuries including but not limited to, humiliation, loss of self-esteem, hurt, fear, frustration, emotional distress inconvenience and damage to his professional reputation.

163.   As a proximate result of Defendant's actions, Plaintiff suffered damages in the form of lost wages, lost compensation, future lost earnings, economic losses, future loss of retirement benefits.

## PRAYER FOR RELIEF

164.    For each Count,  Plaintiff seeks an award of damages for back-wages, front-wages, lost benefits, pecuniary damages, non-pecuniary damages, compensatory

20

damages, injunctive relief (including reinstatement and/or front wages), prejudgment interest, post judgment interest, nominal damages, attorneys' fees and costs and all other available relief under the law.

### JURY DEMAND

165.     Plaintiff demands a jury trial on all counts.

<div style="margin-left:auto;">

***Morris E. Fischer /s/***
Bar No. 490369
Law Office of Morris Fischer, LLC
1400 Spring Street, Suite 350
Silver Spring, MD 20910
301-328-7631 Phone
morris@mfischerlaw.com


***Daniel E. Kenney /s/***
Bar No. MD0025
Daniel E. Kenney, Esq.
DK Associates, LLC
5425 Wisconsin Avenue, Suite 600
PMB #653
Chevy Chase, MD 20815
202-430-5966 Phone
dan@dkemployment.com

</div>